## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH J. DOBISH AND MARIA J. DOBISH, Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>M&T BANK CORPORATION; M&T BANK; ASSURANT, INC.; and AMERICAN SECURITY INSURANCE COMPANY,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiffs Joseph J. Dobish and Maria J. Dobish (hereinafter "Plaintiffs"), by and through their undersigned counsel, make the allegations listed herein upon information and belief, except for those allegations that pertain to Plaintiffs, which are based on Plaintiffs' personal knowledge, against M&T Bank Corporation ("M&T Corp."), M&T Bank ("M&T Bank," and collectively with "M&T Corp.," "M&T"), Assurant, Inc. ("Assurant"), and American Security Insurance Company ("ASIC," and collectively with Assurant, "Assurant-ASIC"). M&T and Assurant-ASIC are each a "Defendant" and collectively are "Defendants."

### I.      INTRODUCTION

1.      Plaintiffs and the proposed Class members have home equity lines of credit ("HELOCs") or mortgages that are secured by residential properties, and were charged for force-placed (also known as "lender-placed") insurance by Defendants.

2.      Although lenders generally have the right to force-place hazard, flood, wind, and/or even earthquake insurance (all of which are a form of "hazard" insurance) where the property securing the loan is not insured by the borrower, M&T has flagrantly abused that right by (a) force-placing backdated and/or excessive insurance coverage; (b) accepting kickbacks, commissions, or other compensation in connection with such coverage; and (c) otherwise

manipulating the force-placed insurance process.

3.     Plaintiffs allege that Defendants have derived, and continue to derive, improper financial benefits by imposing force-placed insurance policies and other charges on their property, and a class of borrowers defined in paragraphs 79-81 below (collectively the "Class"). Further, M&T improperly charged Plaintiffs and the Class for M&T's procuring force-placed insurance from its contracted carrier, Assurant-ASIC, but did so pursuant to a pre-arranged undisclosed agreement, where they charged an inflated price for the policy and where M&T also agreed to receive commissions and kick-backs transferred back to M&T and/or its related entities from its insurance carrier. M&T has breached its contract with Plaintiffs and the Class by, *inter alia*, entering into this unlawful kick-back scheme and overcharging the Plaintiffs and the Class to pay for the kick-backs. This scheme became a large profit center for M&T.[1]

4.     Assurant-ASIC actively participated in this scheme, which is explained in further detail *infra*, by issuing backdated force-placed insurance policies for M&T and by agreeing with M&T to pay kickbacks, commissions, or other compensation to M&T in return for this lucrative business.

5.     A November 10, 2010 article in American Banker first revealed that force-placed insurance creates a financial windfall for the major national mortgage lenders. *See* Ex. 1, Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (Nov. 10, 2010, 12:00 p.m.), http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html [hereinafter "*Ties to Insurers*"]. Assurant, the parent company of ASIC, experienced an 11% drop in its stock price the day after the American Banker article was published.

6.     Notwithstanding the deceptive kickbacks, commissions, and backdating scheme

---

[1] Note, Plaintiffs do not challenge the rate of their force-placed insurance policy as excessive. Rather, Plaintiffs challenge, among other things, M&T's decision to purchase force-placed insurance from Assurant-ASIC which, in turn, provides an improper financial benefit to M&T and/or their affiliates.

discussed in *Ties to Insurers*, internal emails reveal that numerous bank employees admitted that the rates cited in the article were "unreasonable" and needed to be changed. *Id.*

7.      Defendants acted capriciously, engaged in this conduct in bad faith, and in contravention of the parties reasonable expectations knowing that their actions were (a) not authorized by HELOC or mortgage contracts of Plaintiffs or the Class members and (b) inconsistent with applicable law.

8.      M&T has preyed on the Plaintiffs and the Class members as an opportunity to obtain additional profits and has done so in breach of its contract.

9.      Based on this conduct, Plaintiffs, on behalf of themselves and similarly situated Class members, assert claims against M&T for breach of contract and breach of the covenant of good faith and fair dealing (Count I), unjust enrichment (Count II), violation of the federal Truth in Lending Act (TILA) (Count III), and conversion (Count IV). In addition, Plaintiffs, on behalf of themselves and similarly situated Class members, assert claims against Assurant-ASIC for unjust enrichment (Count V) and tortious interference with a business relationship (Count VI).

10.     Plaintiffs, on behalf of themselves and similarly situated Class members, have sued to recover damages equal to the amount of the improper and inequitable financial benefit received by Defendants and/or their affiliates as a result of these anti-consumer practices, and seek, *inter alia*, injunctive relief, corresponding declaratory relief, monetary relief, and other appropriate relief as determined by this Court for Defendants' unlawful conduct, as described herein.

## II.      PARTIES

11.     Plaintiffs Joseph J. Dobish and Maria J. Dobish are married and the couple resides in Wilkes Barre, Pennsylvania. Plaintiffs are members of the proposed "Nationwide Class," as well as the "Account Subclass" and "PA Subclass," as defined below.

12.     Defendant M&T Corp., a New York corporation, is a bank holding company headquartered in Buffalo, New York, providing financial services through its principal subsidiary, M&T Bank, and its subsidiaries. *See* Ex. 2, M&T Corp.'s 2012 Form 10-K

[hereinafter "M&T 10-K"]) at 4-6. M&T Corp. can be served through M&T Bank Corporation, Attn: General Counsel, One M&T Plaza 12th Floor, Buffalo, New York 14203-2399.

13.     Defendant M&T Bank, a wholly owned subsidiary of M&T Corp., is the principal subsidiary of M&T Corp. and accounts for "99% of the consolidated assets of the company." *See* M&T 10-K, Ex. 2 at 4. As of December 31, 2012, M&T held assets amounting to approximately $82.1 billion. *Id.* M&T Bank's main offices are located in Buffalo, New York. M&T Bank and its affiliates provided mortgage banking services throughout the United States, although principally in the states of New York, Pennsylvania, Maryland, Delaware, Virginia and the District of Columbia. *Id.* In addition, M&T Bank operates over 700 branches across the United States, Canada and the Cayman Islands. *Id.* M&T Bank can be served through M&T Bank Corporation, Attn: General Counsel, One M&T Plaza 12th Floor, Buffalo, New York 14203-2399.

14.     Assurant, the parent of ASIC, is a publicly-traded Delaware corporation with its principal place of business located at New York, New York. According to its 2012 Annual Report, "the majority of our [Assurant's] lender-placed agreements are exclusive" and those contracts require Assurant "to issue these policies automatically when a borrower's insurance coverage is not maintained." *See* Ex. 3, Assurant, Inc., Form 10-K [hereinafter "Assurant Form 10-K"], at 5. Assurant, along with QBE, controls about 90% of the force-placed insurance market. *See* Ex. 4, Mary Williams Walsh, New York investigates Insurer Payments to Banks, N.Y. Times (May 21, 2012), http://www.nytimes.com/2012/05/22/business/new-york-investigates-home-insurer-payments-to-banks.html.   Assurant can be served through can be served through its statutory agent Corporation Service Company at 2711 Centerville Road, Ste. 400, Wilmington, DE 19808.

15.     Defendant ASIC is a Delaware organized insurance company writing force-placed insurance policies in all fifty states and the District of Columbia with its principal place of business located at Atlanta, Georgia. It is a wholly-owned, domestic operating insurance subsidiary of Assurant. ASIC sometimes operated under the trade names Assurant Solutions and

Assurant Specialty Property. ASIC contracts with mortgage lending and servicing entities, including upon information and belief, M&T Bank and its affiliates, whereby ASIC acts as a force-placed insurance vendor. *See* Ex. 3, Assurant Form 10-K at 4-5. ASIC's duties include, but are not limited to, tracking loans serviced by M&T Bank and its affiliates, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's property insurance has lapsed. *Id.* ASIC can be served through its statutory agent Corporation Service Company at 2711 Centerville Road, Ste. 400, Wilmington, DE 19808.

### III.    JURISDICTION AND VENUE

16.    Plaintiffs Joseph J. Dobish and Maria J. Dobish were at all relevant times hereto, citizens of the State of Pennsylvania.

17.    This Court has jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d) because the aggregated amount in controversy exceeds $5,000,000 and Plaintiffs are citizens of a State different from Defendants. Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated. 28 U.S.C. § 1332(d)(6).

18.    This Court also has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331.  Plaintiffs' state law claims arose out of the same transaction and occurrence as their TILA claim – specifically, all claims arose out of M&T Bank's commissions and kickbacks scheme, its efforts to increase kickbacks by requiring backdated and/or excessive insurance, and its manipulation of the force-placed insurance process – and are so related to Plaintiffs' TILA claim that they form part of the same case or controversy.

19.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a) and (c). A substantial part of the events giving rise to Plaintiffs' claims occurred in this District and Defendants are subject to personal jurisdiction in this District.

## IV.   FACTUAL ALLEGATIONS

### A.   Plaintiffs Joseph J. Dobish and Maria J. Dobish

20.   Plaintiffs Joseph J. Dobish and Maria J. Dobish took out a home equity line of credit ("Dobish HELOC") in the amount of $55,250 with M&T that was secured by their home at 155 Spruce Street Wilkes Barre, PA 18702-4552 (the "Dobish Property").

21.   On or around June 2, 2013, Plaintiffs received a letter from M&T wherein M&T informed Plaintiffs that their property was in a Special Flood Hazard Area ("SFHA"). As such, M&T required that Plaintiffs provide proof of flood insurance coverage. Plaintiffs, however, were unaware of any requirement to carry flood insurance on their property.

22.   Plaintiffs contacted the City of Wilkes-Barre, Department of Planning and Zoning, for information on the Dobish Property concerning its classification in a SFHA. In response to their query, the City issued a report to Plaintiffs on June 19, 2013, which clearly states that the Dobish Property is not in a SFHA. *See* City of Wilkes-Barre No Flood Zone Certification (Ex. 5). Plaintiffs sent a copy of this official certificate from the City of Wilkes-Barre to M&T as evidence that the Dobish Property was not in a flood zone in an effort to rectify what they believed was a simple misunderstanding.

23.   On or around June 30, 2013, Plaintiffs received another notice from M&T that informed them that M&T had purchased a flood insurance policy on the Dobish Property from ASIC at a cost of $498.00, with such premium being charged against the Dobish HELOC. Prior to M&T charging the Dobish HELOC for such insurance charge, the account had a zero (0) balance.

24.   The ASIC flood insurance policy purchased by M&T was force-placed on Plaintiffs and was backdated to May 29, 2013 and was to expire on May 29, 2014, notwithstanding that (a) no loss had occurred on the Dobish Property prior to the time the insurance was placed and (b) Plaintiffs had a zero balance on the Dobish HELOC.

25.   On or around July 12, 2013, Plaintiffs received a letter from M&T stating that the Dobish Property was in a SFHA and that Plaintiffs would need to provide documentation from

the Federal Emergency Management Agency ("FEMA") to support any disagreement with the decision of M&T to force-place insurance coverage on the Dobish Property.

26.     On July 15, 2013, Plaintiffs wrote a letter to M&T and instructed M&T to immediately close the Dobish HELOC.

27.     On August 16, 2013, Plaintiffs received a letter from M&T stating that the Dobish HELOC had been closed as of August 8, 2013 (which was nearly three weeks after M&T had been instructed to close the account).

28.     On August 18, 2013, Plaintiffs received a letter from M&T that stated the ASIC flood insurance policy on the Dobish Property had been cancelled because "Evidence of other insurance coverage has been provided." *See* ASIC Cancellation Letter. This explanation was patently incorrect, as Plaintiffs neither procured nor provided any other flood insurance policy (Ex. 6).

29.     On or about August 22, 2013, Plaintiffs received a check from M&T Bank for $391, which was a partial refund for the ASIC flood insurance policy premium. The payment due Plaintiffs, however, was $527.63 – the amount charged to Plaintiffs for the ASIC flood insurance along with interest charges thereon.

30.     On or about September 26, 2013, Plaintiffs received a determination document from FEMA that showed the Dobish Property was not in a SFHA. *See* FEMA Determination Letter (Ex. 7). Plaintiffs sent a copy of the FEMA Determination Letter to M&T.

31.     As of the date of the filing of this Complaint, M&T has continued to refuse to refund the additional portion of Plaintiffs' ASIC flood insurance premium that was retained along with the interest charged thereon, despite Plaintiffs having provided evidence from FEMA, as requested by M&T, stating that the Dobish Property is not in a SFHA.

32.     M&T purchased this unnecessary and backdated force-placed insurance policy from Assurant-ASIC, and upon information and belief, Assurant-ASIC paid M&T a commission, kickback, or other form of compensation for purchasing this force-placed insurance policy. The Dobish HELOC does not authorize M&T to charge Plaintiffs' account regardless of whether

M&T received compensation through such charges, and also does not authorize M&T to purchase an unnecessary, backdated insurance policy and charge Plaintiffs for the premium of the same.

## B.   Force-Placed Insurance Background

33.    In order to ensure that the lender's interest in the secured property is protected, HELOC and mortgage contracts typically allow the lender or third-party servicer discretion to "force-place" hazard, flood, wind, and/or even earthquake insurance (all of which are a form of "hazard" insurance) to protect the lender's financial interest when the homeowner fails to maintain the proper amount of insurance, with the amounts disbursed for the procurement of such insurance becoming additional debt secured by the HELOC or mortgage. Once a lender and/or servicer receives evidence that a borrower has obtained his or her own insurance policy, the force-placed coverage is (or should be) cancelled without delay and the premiums should be fully or partially refunded.

34.    Unfortunately, borrowers have no power to dictate the actions of the lender or loan servicer in selecting a force-placed insurance policy. As a result, the loan servicing industry has developed business strategies designed to create as much additional revenue as possible from unsuspecting and helpless borrowers. Force-placed insurance is an area where such self-dealing and profiteering is readily apparent.

35.    Hence, force-placed insurance policies are almost always more expensive than standard insurance coverage, as is clearly shown by Plaintiffs' policy. Reportedly, such policies can cost as much as ten times (10x) more than standard policies. Further, force-placed policies often provide less coverage than a policy obtained by the borrower. While the force-placed insurance policy is primarily for the benefit of the lender, the excessive cost, which results from the kickbacks and/or commission payments contained in the premium, is passed on to the borrower. This kick-back scheme between M&T and Assurant-ASIC and its subsidiaries violates the terms of the HELOC. *See Ties to Insurers*; *see also American Banker Wins Investigative Journalism Award*, American Banker (Mar. 18, 2011),

http://www.americanbanker.com/news/sabew-1034635-1.html (Ex. 8).

36.     Plaintiffs' HELOC allows M&T to force-place insurance. The discretion afforded to M&T to force-place insurance, however, is limited by the bounds of reasonable conduct and by the express terms of the HELOC itself. M&T routinely exceeds the bounds of reasonableness and the spirit, intent, and letter of the HELOC or mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect the lender's security interest in the property and through other conduct described herein with respect to lender-placed insurance.

37.     Specifically, the Dobish HELOC does not disclose that the lender or loan servicer will receive an improper financial benefit (regardless of the form) in connection with the force-placed insurance policy.

38.     The failure to include any provision in a HELOC or mortgage contract that would allow the lender or servicer to make profit from the force-placement of insurance is logical, as the purpose of a HELOC or mortgage is to create a lien against property that becomes void upon repayment of an underlying sum due. The ability of the lender to force-place insurance on its collateral until the HELOC or mortgage has been repaid, where the borrower does not have adequate insurance coverage, is simply an option the lender can choose to exercise to protect the collateral, and this option is not material to essence of the mortgage or HELOC contract. Instead, the option allows the lender to volitionally choose to defray risk of collateral damage/loss in cases where the lender feels it is warranted.

39.     With this understanding, Plaintiffs allege on behalf of themselves and similarly situated Class members, that charging force-placed insurance premiums containing undisclosed kickbacks, commissions, or other forms of compensation as additional debt secured by the HELOC or mortgage constitutes a credit transaction subject to TILA.

**A.     M&T Has A Common Undisclosed Lucrative Pre-Arranged Agreement to Refer Borrowers to Certain Force-Placed Insurance Providers**

40.     The force-placing of insurance policies by M&T is a very lucrative business for them. M&T has a common practice of selecting the provider in accordance with a pre-arranged

agreement and force-places the policy in such a way as to receive an improper financial benefit. M&T benefits by placing the policy either: (a) with an affiliate; or (b) with a third-party provider such as Assurant and its subsidiaries, such as ASIC, with whom it has already agreed to share revenue in the form of a direct payment or through a "captive reinsurance agreement" whereby "reinsurance" premiums are ceded to a subsidiary/affiliate of the lender and/or servicer.

41.     Although M&T has tried to keep its own kick-back commission arrangement with ASIC secret, it is well-known that ASIC pays millions of dollars in commissions each year to lenders and/or loan servicers, including M&T, that force-place coverage through ASIC, or another wholly-owned subsidiary of its parent company, Assurant.

42.     This commission arrangement forms the basis of Plaintiffs' unjust enrichment claims against Assurant-ASIC. Specifically, Plaintiffs on behalf of themselves and similarly situated Class members, allege that they have conferred a benefit upon Assurant-ASIC, and Assurant-ASIC has accepted and inequitably retained such benefit, by being forced to pay for premiums on insurance policies that were inflated and backdated as a result of kickbacks and commissions between Assurant-ASIC and its lender/servicer clients, including M&T, for the exclusive right to force-place insurance. This benefit was not authorized under the terms of Plaintiffs', or the Class members', HELOC or mortgage contracts, and was conferred independent of any contractual obligation Plaintiffs, or the Class members, have with M&T to maintain required insurance on the property at issue.

43.     Under the direct payment arrangement, the provider of the force-placed insurance policy pays a portion of the premium collected either directly to the lender and/or servicer or to a subsidiary posing as insurance "agent" as a commission or as a "reimbursement" of the lender and/or servicer's "incurred expenses" related to force-placing the insurance. Typically, where such payments are commissions, they are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the lender and/or servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

44.     Under the captive reinsurance arrangement, the provider of the force-placed

10

insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring lender and/or servicer. In return for the subsidiary's purported agreement to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy. For example, ASIC's parent company, Assurant, the nation's largest provider of force-placed insurance with multiple subsidiaries and affiliates, from whom M&T purchases its force-placed insurance policies, has acknowledged that its force-placed insurance division "write[s] business produced by clients, such as mortgage lenders and servicers and financial institutions, and reinsures all or a portion of such business to insurance subsidiaries of the clients." *See* Assurant Form 10-K, *supra*, at F-55.

45.     Illustrative of the typical kickback arrangements is the following graphic from American Banker – *Ties to Insurers*:



46.     Plaintiffs and the Class members have no say or input into the carrier or terms of the force-placed insurance policies. The terms and conditions of the insurance policy, as well as

the cost of the policy, are determined by the lender and/or servicer and the insurer, rather than negotiated between the borrower and the insurer.

47.     M&T has no incentive to comparison shop for the best rate as the cost is just passed along to the Plaintiffs and Class. Rather, M&T is financially motivated to refer Plaintiffs and members of the Class to the providers, such as Assurant-ASIC, that will provide the best financial benefit to M&T in terms of commissions and/or ceded reinsurance premiums.

48.     It is M&T's common practice to enter into an agreement with Assurant, including its subsidiary ASIC, pursuant to which it refers borrowers, including Plaintiffs and the Class members, exclusively to the provider for force-placed insurance. For example, in its public filings, Assurant states that it establishes "long-term relationships" with leading lenders and servicers and that the majority of its lender-placed agreements are exclusive. *See* Assurant Form 10-K, *supra*, at 5 ("The majority of our lender-placed agreements are exclusive.").

49.     Upon information and belief, M&T, either on its own or through its controlling parent companies, is party to an agreement with Assurant-ASIC pursuant to which it receives payments for the referral of business through one or more of the arrangements described above, which, among other things, inflates the cost of the policy to Plaintiffs and the Class members.

50.     Force-placed insurance policies are not underwritten on an individual policy basis. Rather, M&T contracts with force-placed insurance providers such as Assurant-ASIC and/or its subsidiaries require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

51.     Upon information and belief, it is M&T's common practice to actually outsource its insurance processing to Assurant, and its subsidiary ASIC. Assurant-ASIC then continuously monitors the lender and/or servicer's loan portfolio and verifies the existence of insurance on each secured property. In the event that either Plaintiffs or any Class member does not maintain adequate insurance coverage, Assurant-ASIC promptly issues an insurance certificate on the property on behalf and for the benefit of M&T. Thus, where M&T receives commissions from force-placed insurance providers (which are ultimately charged to Plaintiffs or to members of the

Class), they are also performing ***no actual service*** for the commissions and kick-backs they receive other than simply providing the referral and implementing the scheme as a profit center. *See Ties to Insurers*, *supra*.

52.     "The incentives and potential for abuse in the administration of LPI [lender-placed insurance] are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases; the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage." *See* Ex. 9, *Insurance Oversight: Policy Implications for U.S. Consumers, Businesses and Jobs: Hearing Before the Subcomm. on Insurance, Housing & Community Opportunity Comm. on Financial Services* (July 28, 2011) (Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice) [hereinafter "*Birnbaum Testimony*"].

53.     In addition, "[t]he prices for residential property LPI [lender-placed insurance] are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%. Incredibly, lenders get a commission – totaling hundreds of millions of dollars – out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral. The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance – so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [*sic*] insurance." *Id.*

54.     M&T profits greatly from the business of force-placed insurance, and upon information and belief, it is its common policy to maintain a shroud of secrecy and does not separately report its income from payments received from providers of force-placed insurance. However, according to a recent article published by American Banker, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year." *See Ties to Insurers*, *supra* (noting that servicers demand generous commissions and other payments in return for their referrals).

13

55.     Lenders and/or servicers such as M&T commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, as American Banker noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry – even after accounting for the generous commissions and other payments that servicers demand.

*See Ties to Insurers*, *supra*.

56.     Force-placed insurance providers have tools to assess risk and minimize unexpected risk of loss. As stated succinctly in January of 2007 by industry insider John Meadows, "Leveraging technologies and data elements that are available in most servicer's systems, an innovative lender-placed carrier can offer products that take into account relevant property-specific risk characteristics to determine premium rates." *See* John Meadows, *Evaluate Processes and Controls to Ensure Insurance Efficiencies*, Servicing Management (Jan. 2007) (Ex. 10).

57.     Lenders and/or servicers such as M&T also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting. *See id.*

**B.     Defendants Charge Borrowers, Including Plaintiffs and Class members, for Unnecessary Insurance**

58.     Unnecessary or inappropriately priced insurance arises when a lender and/or servicer forces borrowers, such as Plaintiffs and the Class members, to purchase and maintain hazard, flood, or similar insurance for their property that is unnecessary, duplicative, and/or in amounts greater than required by law or their HELOC and mortgage agreements.

59.     Motivated by the lucrative financial incentive associated with force-placing

insurance, upon information and belief, M&T has commonly required borrowers to pay for unnecessary insurance coverage. For example, M&T backdates force-placed insurance policies of the Plaintiffs and the Class so that they cover time periods already passed when the policy is placed, thus requiring borrowers to pay for retroactive coverage for by-gone periods of time for which no risk of loss any longer exists. Plaintiff and the Class members were subjected to these practices by being charged for retroactive coverage for which there was no risk of loss to Defendants.

60.     Simply put, force-placed insurance policies for hazard, flood, and similar insurance, or any other type of insurance, should not be backdated. The National Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective in nature." *See, e.g.*, *Ties to Insurers*, *supra* (quoting the NAIC as stating that insurance policies "should not be back-dated to collect premiums for a time period that has already passed"). Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss is improper and unlawful.

61.     Information concerning M&T's common practice of collecting kickbacks from force-placed insurance providers has not been publicly available, or disclosed to Plaintiffs or to the Class members. As *American Banker* noted, "banks do not report how much they collect from such payments," and further, force-placed insurance has been "historically an overlooked niche in the mortgage servicing industry." *See* Jeff Horwitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, American Banker (Mar. 10, 2011), http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html [hereinafter "*Bead on Banks' FPI Policies*"] (Ex. 11).

62.     In fact, Plaintiffs and the Class members would have been more than hard pressed to discover fully the true contours of Defendants' scheme because, upon information and belief, captive reinsurance companies are often not required to file with the National Association of Insurance Commissioners ("NAIC") the type of detailed annual reports usually required by commercial insurance companies. *See, e.g.*, Janis Mara, *Industry News, Wells Fargo, Citibank*

*Under      Investigation      in      Alleged      Kickback      Schemes*  (Mar.      7,      2005),
http://www.alta.org/indynews/news.cfm?newsID=2571   (Ex.   12).  Thus,  even  the  most
sophisticated borrower could not, for example, simply contact the NAIC to obtain information on
an  affiliated  captive  reinsurer  used  by  M&T.  One  would  need  a  subpoena  to  obtain  such
information; and to obtain a subpoena, one would have to file a lawsuit.

**C.**     **Defendants' Practices Artificially Inflate Premiums for Force-Placed Insurance**

63.     As American Banker observed, "[w]hile servicers that partner with force-placed
insurers  customarily  perform  little  of  the  work  in  monitoring  their  portfolios  for  lapses  and
writing policies, payments to them are simply a cost of doing force-placed business." *See Ties to
Insurers*, *supra*. These costs, which often include fees for servicing the loan portfolio, are
ultimately paid by the borrowers.

64.     Notably, ASIC's parent, Assurant, indicates in its public filings that approximately
40% of its force-placed insurance division's revenue is allocated to pay for "general expenses."
Upon  information  and  belief,  this  category  predominantly  includes  commissions/referral  fees
paid to lenders and/or loan servicers. In other lines of insurance, overhead and expenses are
usually a much smaller fraction of policyholder claims. *See id.*

65.     Indeed, industry analysts have opined that referral fees, commissions and other
payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to
borrowers, is higher – implying paydays for servicers amounting to hundreds of millions of
dollars per year. *Id.*

66.     Defendants' common practices of setting up a systematic kick-back force-placed
insurance program and unlawfully profiting from the force-placement of insurance policies tend
to keep premiums for force-placed insurance artificially inflated over time because a percentage
of Plaintiffs' premiums, and those of the Class members, are not actually being paid to cover
actual risk, but are instead simply funding a kickback scheme. Amounts paid to M&T as kick-
back commissions and reinsurance premiums have become a part of the cost of doing business

for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of such kickbacks – to the detriment of consumers, including Plaintiffs and the Class members.

67.     Such kickback arrangements between Assurant-ASIC and its lender/servicer clients, including M&T, are unquestionably unjust. In fact, numerous courts have previously denied motions to dismiss, condemned this type of self-dealing in connection with force-placed insurance, and questioned the commissions that the various subsidiaries of Assurant, like ASIC, pay to their lender-clients. *See, e.g.*, *Leghorn v. Wells Fargo Bank*, --- F.Supp.2d ---, 2013 WL 3064548 (N.D. Cal. June 19, 2013); *Martorella v. Deutsche Bank Nat. Trust Co.*, --- F.Supp.2d ---, 2013, WL 1137514 (S.D. Fla. Mar. 18, 2013); *Casey v. Citibank*, N.A., No. 12-820, --- F.Supp.2d ---, 2013 WL 11901 (N.D.N.Y. Jan. 2, 2013); *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, No. 11-3058, 2012 WL 1029502, at *23-29 (N.D. Cal. Mar. 26, 2012); *Ellsworth v. U.S. Bank, N.A.*, No. 12-2506, --- F.Supp.2d ---, 2012 WL 6176905 (N.D. Cal. Dec. 11, 2012); *Gallow v. PHH Mortg. Corp.*, No. 12-1117, --- F.Supp.2d ---, 2012 WL 6761876 (D.N.J. Dec. 31, 2012); *Karp v. Bank of America Corp.*, No. 12-cv-1700 (M.D. Fla. March 18, 2013); *Montanez v. HSBC Mortg. Corp.* (USA), No. 11-4074, --- F.Supp.2d ---, 2012 WL 2899371, at *6 (E.D. Pa. July 17, 2012); *Hofstetter v. Chase Home Fin. LLC*, No. 10-131, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011); *Williams v. Wells Fargo Bank N.A.*, No. 11-21233, 2011 WL 4901346, at *2, 4 (S.D. Fla. Oct. 14, 2011); *Gipson v. Fleet Mortg. Group, Inc*., 232 F.Supp.2d 691, 707 (S.D. Miss. Nov. 7, 2002); *Stevens v. Citigroup, Inc*., No. 00-3815, 2000 WL 1848593, at *1, 3 (E.D. Pa. Dec. 15, 2000).

68.     These kick-back commission arrangements, such as commonly practiced by the Defendants, are also the subject of publicly-filed deposition testimony. For example, in the *Hofstetter* case, Chase's representative testified that it is "a standard industry-wide practice" for a mortgage lender to be paid a commission by the insurance provider in connection with lender-

placed insurance. *See* Wheeler Dep. 67:5-14, Jan. 11, 2011 (Ex. 13).[2] Like M&T, Chase procured its force-placed insurance coverage through a subsidiary of Assurant. *Id.* at 68:16-69:14.

69.     In addition, the commission arrangements between major banks and insurance firms – including ASIC's parent company, Assurant – have been reported in American Banker magazine. *See Ties to Insurers*, *supra*.[3]  And in September 2013, Assurant and a major-lender agreed to a $300 million settlement to resolve accusations that they forced homeowners into buying overpriced property insurance and entered into kickback arrangements that inflated policy prices. *See JPMorgan and Insurer Settle Suit*, DealBook (Sept. 9, 2013), http://dealbook.nytimes.com/2013/09/09/jpmorgan-and-insurer-settle-suit/?nl=business&emc=edit_dlbkam_20130910 (Ex. 14). The class-action lawsuit alleged the force-placed insurance practices unjustly enriched the lender and Assurant by more than $1 billion since 2008. *Id.*

70.     Moreover, the commissions paid by Assurant to its lender-clients are also the subject of public regulatory filings. For example, ASIC reported to the California Department of Insurance that it paid more than $1.8 million dollars in commissions and brokerage expenses in connection with its force-placed flood insurance program in 2010. *See* ASIC California Regulatory Filings (Ex. 15).

71.     While significant, this figure represents only a sliver of the total amount of commissions paid by Assurant nationwide on all force-placed policies (flood, hazard, and wind).

---

2  Shortly after the deposition testimony in *Hofstetter* became public (in March 2011), Chase entered into a multi-million dollar settlement (in July 2011), under which it agreed to disgorge 100% of the commissions that it received on force-placed flood insurance for eligible class members, and permanently refrain from accepting commissions in connection with force-placed flood insurance for HELOC borrowers.  Following notice to the class members, that settlement received final approval from the United States District Court for the Northern District of California (Alsup, J.) on November 14, 2011.


3  After publication, this article received the Society of American Business Editors and Writers award for "best investigative" writing for publications with a circulation of below 25,000.

According to a recent article published by American Banker, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars each year." *See Bead on Banks' FPI Policies, supra*. Even more shocking, is that while these lenders and/or servicers are bringing in hundreds of millions of dollars through its involvement in force-placed insurance, this same practice is forcing many homeowners that are struggling to pay their current mortgage payments into foreclosure.

72.     In return for the millions of dollars in commissions that are kicked back to M&T as well as other lenders and/or servicers, ASIC and its parent company, Assurant, reap billions of dollars in premiums. For example, in 2012, Assurant collected approximately $1.9 billion in premiums through its specialty insurance division, which is primarily devoted to force-placed insurance. *See* Assurant Form 10-K, *supra*, at 3.

73.     On March 14, 2012, Fannie Mae issued a Servicing Guide Announcement ("SGA") pertaining to lender-placed insurance. *See* SGA (Ex. 16). In the SGA, Fannie Mae clarified its requirements relating to reasonable reimbursable expenses for lender-placed insurance, and stated that "reimbursement of lender-placed insurance premiums must **exclude** any lender-placed insurance commission earned on that policy by the servicer or any related entity[.]" *Id.* at 4 (emphasis in original).[4]

74.     Earlier that same month, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") relating to lender-placed insurance. *See* RFP (Ex. 17).[5]  In the RFP, Fannie Mae stated that it had conducted an "extensive internal review" of the lender-placed insurance

---

4  The U.S. Department of Housing and Urban Development has promulgated similar guidance in its Lender Manual ("HUD Lender Manual").  *See* HUD Lender Manual, 6-A-14 to -15, (Ex. 18).

5  The RFP was labeled "Confidential" by Fannie Mae, but subsequently was published in *American Banker* magazine.  *See* Jeff Horwitz, *Fannie Mae Seeks to Break up Force-Placed Market, Document Shows*, American Banker, May 24, 2012, http://www.dimontandassociates.com/05-29-12-fannie_mae_force-placed.html (Ex. 19).

process, and found that the process "can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners." *Id.* at 2. In particular, Fannie Mae made the following observations:

> a.      "Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"

> b.      "The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms . . . . Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down."

> a)      "[M]uch of the current legal placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*Id.* Accordingly, Fannie Mae stated that it sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners." *Id.* at 3. Among other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and to "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability." *Id.* at 2.

75.      Also, state attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance. Recently, a coalition of forty-nine (49) state attorneys general entered into an historic joint state-federal settlement agreement with the country's five largest loan servicers ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com, the official website established by the government relating to the settlement; *see also Bead on Banks' FPI Policies*.

76.      Among other terms, the National Mortgage Settlement essentially prohibits servicers from profiting from force-placed insurance. Specifically, under the settlement, mortgage servicers:  (a) shall not obtain force-placed insurance unless there is a reasonable basis

to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance for a commercially reasonable price. *Id*.

77.     In sum, Defendants' conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance industry is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interest or one where they are provided with an incentive or inducement to enter into the transaction. *See Ties to Insurers*, *supra*.

78.     The Defendants do not have rate making authority, and Plaintiffs, on behalf of themselves or the Class members, are not challenging premium rates of the policies but are instead challenging the M&T's manipulation of the force-placed insurance market and its conduct in purchasing force-placed insurance policies that contain hidden kickbacks and/or commissions, duplicate coverage, unnecessary coverage, and/or excessive coverage above that which is necessary to protect the lender's interest. Plaintiffs, on behalf of themselves and the Class members, are challenging the manner in which M&T selects insurers such as Assurant-ASIC, the manipulation of the force placed insurance process, and the impermissible kickbacks that were included in the premiums.

## V.     CLASS ACTION ALLEGATIONS

### A.     Class Definition

79.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. As such, Plaintiffs seek to represent the following classes:

Nationwide Class:   All borrowers who, within the applicable statutes of limitations, were charged for a force-placed insurance policy placed on property located in the United States, through M&T, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

Account Subclass:   All persons in the Nationwide Class whose force-placed insurance premiums were escrowed or charged to a line of credit ("LOC") by M&T.

PA Subclass:  All persons in the Nationwide Class whose mortgage or line of credit owned or serviced by M&T was secured by property located within the State of Pennsylvania.

80.     Except as otherwise provided herein, the term "Class" shall collectively refer to the Nationwide Class, Account Subclass, and PA Subclass as defined above. Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

81.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner. The conduct described above is the Defendants' standard and undisputed business practices.

**B.     Numerosity**

82.     The individual class members are so numerous that joinder of all members is impracticable. The Defendants sell and service millions of mortgage loans and insurance policies in the State of Pennsylvania and nationwide. The individual class members are ascertainable as the names and addresses of all class members can be identified in the business records maintained by the Defendants. The precise number of class members certainly numbers in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint and impractical for each to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.     Commonality**

83.     There are questions of law and fact that are common to the Plaintiffs and Class

members' claims. These common questions predominate over any questions that go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

        a)      Whether M&T breached their respective mortgage or HELOC contracts with Plaintiffs and the Class by (1) arranging for kickbacks, commissions, or other compensation for itself or its affiliates in connection with force-placed insurance; (2) backdating force-placed insurance; and (3) otherwise manipulating to force-placed insurance process.

        b)      Whether Defendants have unlawfully unjustly enriched themselves at the expense of Plaintiffs and the Class;

        c)      Whether M&T breached the implied covenant of good faith and fair dealing by entering into an exclusive arrangement with the vendor and its affiliated insurance carriers which resulted in their charging Plaintiffs and the Class members inflated and non-competitive amounts of force-placed insurance;

        d)      Whether the Defendants manipulated the force-placed insurance purchases in order to maximize the profits to themselves to the great detriment to Plaintiffs and the Class;

        e)      Whether M&T, or their respective affiliates, provide any work or services in order to receive the "economic benefit";

        f)      Whether M&T wrongfully converted funds from Plaintiffs and the Account Subclass;

        g)      Whether it is reasonable and fair to backdate force-placed insurance coverage, and whether M&T has a legitimate financial interest in backdating coverage for time periods in the past during which no loss occurred;

        h)      Whether M&T's conduct as described herein violates TILA by, *inter alia*,

23

changing its contractual agreed upon insurance requirements after-the-fact without proper notice or consent;

i)      Whether Defendants' arrangement and scheme to maximize unwarranted fees and kickbacks is unfair;

j)      Whether Assurant-ASIC had knowledge of Plaintiffs' and the Class members' business relationships with M&T pursuant to the HELOC and mortgage contracts;

k)      Whether Assurant-ASIC intentionally and unjustifiably interfered with the Plaintiffs' and the Class members' rights under the HELOC and mortgage contracts by paying kickbacks to M&T and by charging for administering M&T's loan portfolio;

l)      the appropriateness and proper form of any declaratory or injunctive relief; and

m)      the appropriateness and proper measure of restitution, damages, and other monetary relief.

**D.      <u>Typicality</u>**

84.      Plaintiffs are members of the Class, as Defendants' own records plainly reveal. Plaintiffs' claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of the unlawful conduct of Defendants. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.      <u>Adequacy of Representation</u>**

85.      Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

86.      To prosecute this case, Plaintiffs have chosen counsel that is very experienced in

class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

>
F.      **Requirements of FED. R. CIV. P. 23(b)(1) & (2)**

87.     Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the Class.

88.     Defendants have acted or failed to act in a manner generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

>
G.      **Requirements of FED. R. CIV. P. 23(b)(3)**

89.     The questions of law or fact common to Plaintiffs and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Class. All claims by Plaintiffs and the unnamed Class members are based on the force-placed insurance policies that Defendants unlawfully caused to be secured, and their deceptive and egregious actions involved in securing the force-placed policy.

90.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

91.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

>
H.      **Superiority**

92.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> a)      Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside throughout the United States;

> b)      Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As

a result, individual Class members have no interest in prosecuting and controlling separate actions;

      c)    There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

      d)    The interests of justice will be well-served by resolving the common disputes of potential Class members in one forum;

      e)    Individual suits would not be cost effective or economically maintainable as individual actions; and

      f)    This action is manageable as a class action.

## VI.    CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (All Class Members Against M&T)

93.    Plaintiffs, on behalf of themselves and all Class members, re-allege and incorporate paragraphs 1 through 92 above as if fully set forth herein and further allege as follows.

94.    Plaintiffs and all Class members have mortgage or HELOC contracts with M&T which are each similar in all material respects.

95.    Under these mortgage and HELOC contracts, M&T is permitted to obtain force-placed insurance in the event of a lapse. However, it is only permitted to do so in a manner and amount that is reasonable and appropriate to protect the lender's insurable interest in the property. Although these mortgage and HELOC contracts allow M&T to charge the homeowners for force-placed insurance, it does not allow it to charge homeowners, including Plaintiffs and the Class members, for illegal kickbacks, commissions, or reinsurance premiums.

96.    Further, under these mortgage and HELOC contracts, M&T is not permitted to charge the Plaintiffs or the Class members for servicing the debt.

97.    M&T breached its HELOC and mortgage contracts with Plaintiffs and all Class

members in at least the following respects:

a)      Choosing an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting high-priced force-placed insurance policies to maximize their own profits;

b)      Failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby the insurance policies are continually purchased through the same companies without seeking a competitive price;

c)      Assessing inflated and unnecessary insurance policy premiums against Plaintiffs and the Class members, and misrepresenting the reason for the high cost of the policies;

d)      Collecting a percentage or allowing its affiliates to collect a percentage of whatever premiums are charged to Plaintiffs and all Class members and not passing that percentage on to the Plaintiffs or the Class members, thereby creating the incentive to seek the highest-priced premiums possible;

e)      Charging Plaintiffs and the Class members for commissions when the insurance is prearranged and no commission is due; and

f)      Charging Plaintiffs and the Class members for having the vendor perform their obligations of administering its loan portfolio which is not chargeable to Plaintiffs or the Class members.

98.      As a direct, proximate, and legal result of the aforementioned breaches of contract, Plaintiff and Class members have suffered and continue to suffer damages.

99.      What is more, good faith and fair dealing is an element of every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

100.      Where a contract permits one party to unilaterally determine the extent of the other's required performance, an obligation of good faith in making such determination is

implied.

101.    Plaintiffs' and the Class members' respective mortgage and HELOC contracts contained a provision that allowed the lender/servicer to force-place an insurance policy on the borrower if their homeowner's insurance lapsed.

102.    Servicers or lenders, like M&T, are permitted to unilaterally choose the company to purchase force-placed insurance from and have an obligation to exercise their discretion in good faith by not choosing a company capriciously and in bad faith (solely for their or their affiliates own financial gain) instead of seeking to continue to reestablish the prior insurance policies or seeking competitive bids on the open market in good faith.

103.    The respective HELOC and mortgage contracts and insurance policies of Plaintiffs and the Class members contained an implied covenant of good faith and fair dealing whereby M&T agreed to perform the obligations under the policies in good faith, to deal fairly with Plaintiffs and the Class, and not to charge unnecessary inflated fees for the force-placed insurance for the purposes of maximizing their own profits at the expense of the Plaintiffs and Class members.

104.    M&T breached its duty of good faith and fair dealing in at least the following respects:

a)      Using their discretion to choose an insurance policy in bad faith and in contravention of the reasonable expectations of the Plaintiffs and Class members, by purposefully selecting high-priced force-placed insurance policies to maximize M&T's own profits;

b)      Failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby the insurance policies are continually purchased through the same companies without seeking a competitive price;

c) Assessing inflated and unnecessary insurance policy premiums against Plaintiffs and the Class members and misrepresenting the reason for the high cost of the policies;

d) Collecting a percentage or allowing its affiliates to collect a percentage of whatever premiums are charged to Plaintiffs and the Class members and not passing that percentage on to the Plaintiffs and Class members, thereby creating the incentive to seek the highest priced premiums possible;

e) Charging Plaintiffs and the Class members for commissions when the insurance is prearranged and no commission is due;

f) Charging Plaintiffs and the Class members an inflated premium due to the captive reinsurance arrangement; and

g) Charging Plaintiffs and the Class members for having the vendor perform their obligation of administering its loan portfolios which is not chargeable to Plaintiffs or the Class members.

105. As a direct, proximate, and legal result of the aforementioned breaches of the contract and of the implied covenant of good faith and fair dealing, Plaintiffs and the Class members have suffered and continue to suffer damages.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from M&T's breach of contract. Plaintiffs, on behalf of themselves and all similarly situated Class members, further seek all relief deemed appropriate by this Honorable Court, including attorneys' fees and costs.

<u>COUNT II</u>
**UNJUST ENRICHMENT**
**(All Class Members Against M&T)**

106. Plaintiffs, on behalf of themselves and all Class members, re-allege and incorporate paragraphs 1 through 92 above as if fully set forth herein and further allege as follows.

107.   M&T received from Plaintiffs and the Class members an inequitable benefit in the form of charges related to force-placed insurance policies that include, but are not limited to, unwarranted kickbacks and commissions and are the result of overcharging and overreaching.

108.   M&T entered into an agreement whereby the vendor would provide force-placed insurance policies to the M&T through its preferred insurance carriers, such as Assurant-ASIC, for the portfolio of loans it monitored which were paid for by Plaintiffs and the Class members at prices that were far higher than the market rates for policies that provide even more coverage. M&T knew that the charges for these policies were inflated, contained hidden or unlawful charges, and were not the result of good faith practices.

109.   Commissions or kickbacks were paid directly to M&T and/or its affiliates in order to be able to exclusively provide force-placed insurance policies.

110.   The kickbacks and commissions were subsumed into the price of the insurance premium and ultimately paid by the Plaintiffs and Class members. Therefore, M&T had the incentive to charge and collect inflated prices for the force-placed insurance policies.

111.   As a result, Plaintiffs and the Class members have conferred a direct benefit on M&T, and M&T, with full knowledge of this benefit, voluntarily accepted and retained the benefit conferred on it.

112.   M&T will be unjustly enriched if it is allowed to retain the benefit, and each Plaintiff and Class member is entitled to restitution in an amount equal to the amount each Plaintiff and Class member enriched M&T and for which M&T has been unjustly enriched.

113.   Nothing herein seeks to end M&T's practice of placing force-placed insurance on properties. Rather, Plaintiffs and the Class members simply seek that M&T engage in this practice in good faith and not by charging the Plaintiffs and Class members for unlawful, unnecessary, hidden, inflated, and/or noncompetitive prices.

114.   Restitution, under an unjust enrichment theory, is appropriate in lieu of breach of contract damages when the Plaintiffs and Class members had an express contract, but it was also procured by fraud or is unenforceable or not completely effective. Since the unjust enrichment

claim of Plaintiffs and Class members is based on M&T's commonly practiced kick-back scheme and the unjust retention of those commissions including for backdated premiums, Plaintiffs and Class members are entitled to restitution.

115.    The claim for unjust enrichment by Plaintiffs and the Class members against M&T are equitable in nature and independent of any breach of contract by M&T.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against M&T for the amounts equal to the amount that each Plaintiff and Class member enriched M&T and for which M&T has been unjustly enriched. Plaintiffs, on behalf of themselves and all similarly situated Class members, further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

**COUNT III**
**VIOLATION OF THE TRUTH IN LENDING ACT**
**(15 U.S.C. § 1601 *et seq.*)**
**(All Class Members Against M&T)**

116.    Plaintiffs, on behalf of themselves and all Class members, re-allege and incorporate paragraphs 1 through 92 above as if fully set forth herein and further allege as follows.

117.    HELCOs and mortgage loan agreements between M&T and its customers are subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

118.    M&T is a "creditor" as defined by TILA because it owned Plaintiffs' HELOC and changed the terms of that line of credit so as to create a new loan obligation, of which M&T was the creditor.   When M&T added force-placed insurance charges to the Dobish HELOC and charged them interest on these charges, it created a new loan subject to the requirements of TILA.

119.    M&T is required to clearly, conspicuously, and timely disclose all finance charges, other charges, and third-party charges that may be imposed in connection with a

mortgage loan or line of credit.

120.    M&T's disclosure inaccuracies are apparent on the face of the disclosures to Plaintiffs because:  (a) the inaccuracies arose out of M&T's unilaterally changing the terms of Plaintiffs' line of credit;  (b) anti-coercion disclosures included with the Dobish HELOC explicitly stated that the lender was prohibited from conditioning its extension of credit on the borrowers purchasing any insurance product from the lender or its affiliates; (c) Plaintiffs' HELOC does not authorize kickbacks, commissions, or other compensation to M&T or its affiliates for the purchase of force-placed insurance; and (d) Plaintiffs' HELOC does not authorize backdated force-placed hazard insurance.

121.    M&T is further required to accurately and fully disclose the terms of the legal obligations between the parties.

122.    M&T violated TILA by (a) failing to clearly, fully, and accurately disclose its insurance requirements in its HELOCs and mortgages and (b) failing at all times to disclose the amount and nature of the kickbacks, commissions, or other forms of compensation M&T would receive for the purchase of force-placed insurance.

123.    Specifically, when M&T added the force-placed premium charge to the outstanding principal amount of Plaintiffs' line of credit, a new debt obligation was created.  At the moment M&T created this new debt obligation, it was required to provide new disclosures.

124.    12 C.F.R. § 226.18(d) requires disclosures of finance charges, which includes force-placed insurance premiums, including kickbacks under 12 C.F.R. § 226.4(b)(8).  M&T failed to disclose the nature and amount of all finance charges associated with the force-placed insurance premiums it withdrew from Plaintiffs' line of credit and added to their principal balance.  This failure violated TILA.

125.    Plaintiffs' TILA claim is timely.

126.    M&T systematically and pervasively engaged in similar violations of TILA to the detriment of other members of the Nationwide Classes.

127.    Plaintiff and the Nationwide Classes have been injured and have suffered a

monetary loss as a result of M&T's violations of TILA.

128.    As a result of M&T's violations, Plaintiff and the Nationwide Classes are entitled to recover actual damages and a penalty of $500,000 or 1% of M&T's net worth, as provided by 15 U.S.C. § 1640(a)(1) and (2).

129.    Plaintiff and the Nationwide Classes also are entitled to recovery of attorneys' fees and costs to be paid by M&T, as provided by 15 U.S.C. § 1640(a)(3).

130.    In addition, Plaintiff and the Nationwide Classes are entitled to a declaration that M&T's actions violate TILA, and corresponding injunctive relief enjoining M&T from engaging in further such violations.

## COUNT IV
## CONVERSION
### (Account Subclass Against M&T)

131.    Plaintiffs, on behalf of themselves and all Account Subclass members, re-allege and incorporate paragraphs 1 through 92 above as if fully set forth herein and further allege as follows.

132.    M&T had and continues to have a duty to maintain and preserve the mortgage and HELOC accounts of Plaintiffs and the Account Subclass, and to prevent the diminishment or alteration of such accounts through M&T's own wrongful acts.

133.    M&T wrongfully and intentionally collected insurance premiums from the mortgage escrow accounts or HELOC accounts of Plaintiffs and the Account Subclass, or added such payments to the mortgage accounts or HELOC accounts of Plaintiffs and Account Subclass.

134.    M&T collected these premiums by wrongfully and intentionally withdrawing specific and readily identifiable funds from Plaintiffs' account, and of the Account Subclass members, or misappropriating funds paid to Plaintiffs' account balances for their regular monthly mortgage or HELOC payments, or to the account balances of the Account Subclass members, in order to fund its force-placed insurance scheme.

135.    M&T has retained these funds unlawfully without the consent of Plaintiffs and the

consent of the Account Subclass members and has deprived them from exercising control over the funds.

136.    M&T intends to permanently deprive Plaintiffs and the Account Subclass of these funds.

137.    Plaintiffs and the Account Subclass properly own these funds, not M&T, which now claim that it is entitled to ownership of the funds contrary to the rights of Plaintiffs and the Account Subclass.

138.    Plaintiffs and the Account Subclass are entitled to the immediate possession of these funds.

139.    M&T has wrongfully converted these specific and readily identifiable funds.

140.    M&T's wrongful conduct is of a continuing nature.

141.    As a direct and proximate result of M&T's wrongful conversion, Plaintiffs and the Account Subclass have suffered and continue to suffer damages. Plaintiffs and the Account Subclass are entitled to recover from M&T all damages and costs permitted, including all amounts that M&T wrongfully converted, which are specific and readily identifiable.

WHEREFORE Plaintiffs, on behalf of themselves and similarly situated Account Subclass members, demand an award against M&T for the amounts equal to the amount M&T wrongfully converted from each Plaintiff and Account Subclass member. Plaintiffs, on behalf of themselves and all similarly situated Account Subclass members, further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT V
### UNJUST ENRICHMENT
### (All Class Members Against Assurant-ASIC)

142.    Plaintiffs, on behalf of themselves and all Class members, re-allege and incorporate paragraphs 1 through 92 above as if fully set forth herein and further allege as follows.

143.    By scheming with M&T to manipulate the force-placed insurance process,

Assurant-ASIC received improper benefits, including noncompetitive premiums that Assurant-ASIC would not have secured absent the common practice of causing unwarranted kickbacks and commissions to M&T to do business with Assurant-ASIC, and premiums for backdated and unnecessary insurance policies.

144.    Retention of these benefits by Assurant-ASIC would be unjust and inequitable, because Assurant-ASIC secured these handsome premium payments through improper means by offering M&T unwarranted kickbacks and commissions in connection with force-placed insurance coverage.

145.    Further, backdated insurance coverage provides no appreciable value to the Plaintiffs or the Class members where it already is known that no loss was suffered during the backdated period, and to the extent there was a lapse in coverage, given that Assurant-ASIC was responsible for tracking the Plaintiffs' insurance coverage, and those of the Class members, so as to prevent a lapse, it should have taken steps in advance to avoid any purported "need" to backdate coverage.

146.    In furtherance of this scheme, Assurant-ASIC paid and collected significant monies in kickbacks and commissions tied directly to the cost of the force-placed insurance premium (as a percentage).

147.    As a result, Plaintiffs and the Class members have conferred a benefit on Assurant-ASIC, and Assurant-ASIC, with full knowledge of this benefit, voluntarily accepted and retained the benefit conferred on them. What is more, no express contract exists between Assurant-ASIC and any Plaintiff or with any Class member.

148.    Assurant-ASIC will be unjustly enriched if it is allowed to retain the benefit, and each Plaintiff and Class member is entitled to an amount equal to the amount that each Plaintiff and Class member enriched Assurant-ASIC and for which Assurant-ASIC has been unjustly enriched.

149.    Nothing herein seeks to stop the vender or Assurant-ASIC from selling force-placed insurance policies. Rather, Plaintiffs and the Class members simply seek that Assurant-

ASIC provides the same in good faith and not at inflated and noncompetitive prices.

WHEREFORE, Plaintiffs, on behalf of themselves and similarly situated Class members, demand an award against Assurant-ASIC for the amounts equal to the amount that each Plaintiff and Class member enriched Assurant-ASIC and for which Assurant-ASIC has been unjustly enriched. Plaintiffs, on behalf of themselves and all similarly situated Class members, further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT VI
### TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
#### (All Class Members Against Assurant-ASIC)

150.    Plaintiffs, on behalf of themselves and all Class members, re-allege and incorporate paragraphs 1 through 92 above as if set forth herein and further allege as follows.

151.    Each Plaintiffs and Class member has a business relationship with M&T pursuant to their respective HELOC or mortgage contracts. For example, Plaintiffs and the Class members have a right not to be charged exorbitant charges consisting of hidden kickbacks and commissions in bad faith for force-placed insurance.

152.    Assurant-ASIC has knowledge of Plaintiffs and the Class members' business relationships with M&T pursuant to their respective HELOC and mortgage contracts. Assurant-ASIC is not a party to the respective HELOC and mortgage contracts, nor is it a third-party beneficiary. Further, Assurant-ASIC does not have any beneficial, economic, or supervisory interest in the respective contracts.

153.    Assurant-ASIC intentionally and unjustifiably interfered with the Plaintiffs' and the Class members' rights under their respective HELOC and mortgage contracts, as described above by, *inter alia*, engaging in the common practice of paying kickbacks directly to M&T and by charging for administering M&T's loan portfolio, which are purposefully and knowingly charged to Plaintiffs and the Class members.

154.    Plaintiffs and the Class members have suffered damaged and continue to suffer damages as a result of Assurant-ASIC's interference with their respective HELOC and mortgage

contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention to their rights under the agreements.

WHEREFORE, Plaintiffs and the Class members seek a judgment in their favor against Assurant-ASIC for the actual damages suffered by them as a result of Assurant-ASIC's tortious interference. Plaintiffs on behalf of themselves and all similarly situated Class members, further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand judgment against Defendants as follows:

a)      Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the classes as defined above;

b)      Awarding damages sustained by Plaintiffs and the Class as a result of M&T's breach of express and implied contract, together with prejudgment interest;

c)      Finding that the Defendants, M&T and Assurant-ASIC have each been unjustly enriched and requiring each Defendant to refund all unjustly retained benefits to Plaintiffs and the Class members, together with prejudgment interest;

d)      Finding that M&T has wrongfully converted funds and requiring M&T to refund all such wrongfully converted funds to Plaintiffs and the Account Subclass members;

e)      Awarding Plaintiffs and the Class members costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class members' counsel and experts, and reimbursement of expenses;

f)      Awarding damages sustained by Plaintiffs and the Class members as a result of Assurant-ASIC's tortious interference with their business relationship with M&T; and

g)      Such other and further relief as this Court deems just and equitable.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs and the Class members request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated:  November 6, 2013                    Respectfully submitted,

[/s/Peter M. Hartnett,                    ]
Peter M. Hartnett, Esq.
Hartnett Law Office
342 South Salina Street
Syracuse, NY  13202
Telephone: (315) 471-6265
Facsimile: (315) 474-3153
E-mail: pmh4913@yahoo.com

*Local Counsel*

Kenneth G. Gilman (Pro Hac Vice Anticipated)
**GILMAN LAW LLP**
3301 Bonita Beach Road, Suite 202
Bonita Springs, FL  34134
Telephone:  (239) 221-8301
Facsimile:  (239) 676-8224
E-mail:    kgilman@gilmanlawllp.com

*Attorneys for Plaintiffs and the Proposed Class*